UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

OCT 1 8 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| SCOTT D. PLUTA | ) |
| 777 7TH STREET, N.W. #414 | ) |
| WASHINGTON, D.C. 20001 | ) |
| (434)-242-1615 | |
| | CASE NUMBER   1:06CV01806 |
| | JUDGE: Richard W. Roberts |
| **Plaintiff,** | DECK TYPE: Pro se General **~~JURY ACTION~~** |
| **v.** | DATE STAMP: 10/18/2006 |
| CITIGROUP, INC. | ) |
| 399 PARK AVENUE | ) |
| NEW YORK, N.Y. 10043 | ) |
| | ) |
| CITIMORTGAGE, INC. | ) |
| 1000 TECHNOLOGY DRIVE | ) |
| O'FALLON, MO 63368 | ) |
| | ) |
| LARRY OSBORNE | ) |
| 2031 BROOKS DRIVE | ) |
| DISTRICT HEIGHTS, MD 20747 | ) |
| | ) |
| | ) |
| **Defendants.** | ) |

## COMPLAINT

Scott D. Pluta ("Plaintiff"), personally and pro se, files this Complaint against defendants

Citigroup, Inc. ("Citigroup") its wholly owned subsidiary CitiMortgage, Inc. ("CitiMortgage"),

and Larry C. Osborne ("Osborne") (collectively "Defendants"), and, in support hereby states as

follows:

### Nature of the Case

1.     This is a case of predatory lending and outright consumer fraud.   Citigroup

through its subsidiary CitiMortgage created and maintained an atmosphere that allowed one of

their lending agents, Osborne, to violate several federal and District statutes governing mortgage lending and consumer protection laws, and several common law torts. Plaintiff, a first time homeowner, put his trust in the Citigroup name and reputation, only to experience a personal and financial nightmare at the hands of Osborne's fraud and incompetence. In brief, Osborne failed through his own inaction to secure financing that Plaintiff definitively contracted for on September 26, 2005, then misrepresented to Plaintiff that the terms of his mortgage had been secured knowing full well that they had not until the actual day of closing, at which time a stunned Plaintiff was left with no choice but to mitigate his damages.

## Parties

2.     Plaintiff Scott D. Pluta is an individual residing at 777 7th Street N.W. #414, Washington, D.C. 20001.

3.     Defendant Citigroup is a diversified global financial services holding company whose businesses provide a broad range of financial services to consumer and corporate clients. Citigroup has some 200 million client accounts, $1.5 trillion in assets, and conducts business in more than 100 countries. Citigroup is organized under the laws of the State of Delaware, with its principal place of business at 399 Park Ave., New York, N.Y. 10043.

4.     Defendant CitiMortgage is a mortgage banking subsidiary of Citigroup and is one of the nation's largest residential mortgage originators and servicers. CitiMortgage is organized under the laws of the State of New York, with its principal place of business at 1000 Technology Dr., O'Fallon, MO 63368.

5.     Defendant Larry Osborne is a former CitiMortgage employee residing at 2031 Brooks Drive, District Heights, MD 20747.

2

## Jurisdiction and Venue

6.     This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1332, in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states, and 28 U.S.C. § 1331 in that this Court has original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States.

7.     This Court has supplemental jurisdiction over the pendent state claims pursuant to 28 U.S.C. § 1367.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that give rise to the claims occurred in this judicial district.

9.     This Court has personal jurisdiction over all of the Defendants because each Defendant has done one or more of the following actions, any one of which would submit said Defendant to the lawful exercise of personal jurisdiction in the District of Columbia, pursuant to D.C. Code § 13-423 (a):

    (1) Transacts any business in the District of Columbia;

    (2) Contracts to supply services in the District of Columbia;

    (3) Causes tortious injury in the District of Columbia by an act or omission in the District of Columbia;

    (4) Causes tortious injury in the District of Columbia by an act or omission outside the District of Columbia, when the Defendant regularly does or business engages in any residential course of conduct or derives substantial revenue from goods used or consumed or services rendered in the District of Columbia; and/or

    (5) Has an interest in real property in the District of Columbia.

10.    In addition, because each Defendant's activities would lead it to reasonably expect to be haled into a District of Columbia Court, such exercise of in personam jurisdiction is in keeping with the Due Process requirements of the U.S. Constitution.

## Background

11.    Plaintiff has been a customer of Citigroup and its various affiliates since 1999. This relationship began while Plaintiff was an undergraduate student and has evolved to include various checking, savings, and brokerage accounts, a Roth IRA retirement account and various student loans.

### Miami CitiMortgage Pre-approval

12.    In July 2005, while studying for the Florida Bar Exam in Miami, Florida, Plaintiff applied for, and was granted, a pre-approved loan commitment from CitiMortgage for real property in Washington, D.C. ("D.C.").

13.    The pre-approval loan commitment was for a "5/1 TBill ARM" at 5.626% with .125 in points. The capital ratio of the pre-approval loan commitment was, as a percentage of the purchase price, 80% primary loan, 15% Home Equity Line of Credit ("HELOC"), and 5% down payment by Plaintiff. The pre-approval loan commitment was valid for 90 days from date of issue.

14.    An essential term of the pre-approval loan commitment was the relatively small 5% down payment. Plaintiff had recently graduated from school and had very limited savings.

15.    Plaintiff was advised by CitiMortgage Lending Agent Christina Kovacs not to seek pre-approval commitments from other lending institutions, because doing so would injure Plaintiff's credit score.

4

16.    With a CitiMortgage pre-approval loan commitment in hand, over the next several months Plaintiff explored the Washington, D.C. housing market with the assistance of his real estate agent, Alison Farmer of Corus Home Realty ("Plaintiff's Real Estate Agent").

17.    On September 12, 2005, Plaintiff placed an initial offer to purchase condominium unit number 414 located at 777 7th Street NW, Washington, D.C. 20001 (the "Condominium"). As part of the initial offer Plaintiff endorsed, but did not turn over, a $20,000 check for earnest money.

### Plaintiff Solicits Financing for the Condominium

18.    With his initial offer to purchase the Condominium outstanding, Plaintiff sought to choose a lending institution to finance his home purchase. Plaintiff's first preference, as with the pre-approval loan, was his long-time personal bank, Citigroup (through Citigroup subsidiary CitiMortgage).

19.    On the afternoon of September 12, 2005, Plaintiff left work and walked across K Street in Northwest, Washington, D.C. to one of many Citigroup branch locations in the District -- located at 1000 Connecticut Avenue, N.W., Washington, D.C. 20036, (the "Farragut North Citigroup Branch"). Within the main lobby of the Farragut North Citigroup Branch was a hanging sign that read "Mortgages." CitiMortgage Lending Agent Osborne was seated at a desk below said sign when Plaintiff approached to discuss the possibility of CitiMortgage financing the Condominium. At all times Osborne represented himself as an agent of CitiMortgage.

20.    At that initial meeting, Plaintiff advised Osborne of Plaintiff's desire to purchase a home and apprised him of his relevant activities to date including, *inter alia*, Plaintiff's current pre-approval loan commitment from CitiMortgage, the outstanding offer on the Condominium, and Plaintiff's financial status.

21.    Osborne instructed Plaintiff that in order to continue with CitiMortgage on a property located in D.C., Plaintiff would have to withdraw his pre-approval commitment (characterized by Osborne as Plaintiff's "application") with CitiMortgage Lending Agent Kovacs in Miami and apply for a new pre-approval commitment with Osborne.

22.    Osborne represented to Plaintiff that he would be able to secure the best possible terms for Plaintiff of any mortgage lender in D.C.   To support his claim, Osborne cited CitiMortgage and Citigroup's name and reputation, resources, size, and experience; Citigroup's CitiGold member benefits (of which Plaintiff was a member); and a discount on closing costs CitiMortgage offered on properties located in economically depressed areas in D.C.

23.    Based on Osborne's representations, Plaintiff contacted Kovacs and withdrew his pre-approval commitment.

24.    On September 12, 2005, under Osborne's professional care and observation, Plaintiff filled out and submitted a new mortgage loan application to CitiMortgage.

25.    While completing the mortgage application Plaintiff informed Osborne that Plaintiff did not have a "permanent address" for purposes of filling out the mortgage application. Since beginning work on September 6, 2005, Plaintiff had been residing at a friend's apartment near Union Station.   Mr. Osborne instructed Plaintiff that for the purpose of the mortgage application, and indirectly the credit report that CitiMortgage would request through Equifax Mortgage Services, Plaintiff should use his most recent school address in Charlottesville, VA -- 1702 Rugby Ave., Charlottesville, VA 22903.  Plaintiff also provided Osborne with his current work address, 1700 K Street N.W., Washington, D.C. 20006.  Osborne represented to Plaintiff that all communications and correspondence regarding the loan process would be channeled through Osborne to Plaintiff directly either in person, by phone, or by e-mail.

6

26.     On September 14, 2005, Plaintiff accepted a counteroffer for purchase of the Condominium by its owner, Victor Vacanti (the "Condominium Seller"). Closing on the Condominium was scheduled for noon on October 19, 2005.

27.     Also on September 14, 2005, at Osborne's request, Plaintiff provided Osborne with a copy of Plaintiff's offer of employment letter and a copy of the $20,000 earnest money check.

28.     On or about September 19, 2005, Osborne informed Plaintiff that there was a delay in finalizing his loan for the Condominium given a procedural credit issue that would have to be resolved with Plaintiff's private student loan lender, CitiAssist (another subsidiary of Citigroup). As Plaintiff had just recently graduated and his student loans had not yet entered the repayment period, an amortization schedule for repayment had not been finalized. Until a monthly student loan payment was established, CitiMortgage underwriters had to make aggressive assumptions on monthly repayment that would result in Plaintiff's loan application being denied.

29.     On September 19, 2005, at the recommendation of Plaintiff's Real Estate Agent and in light of the CitiAssist issues, Plaintiff met with Scott Davis of Market Street Mortgage Corporation ("Market Street"), a competitor of CitiMortgage in the mortgage lending industry. Plaintiff filled out and submitted a mortgage application with Market Street. Plaintiff took this step to create additional financing options from which to choose a mortgage with the most favorable terms.

30.     On September 20, 2005, Plaintiff delivered a check for $20,000 in "earnest money" to Plaintiff's Real Estate Agent. Plaintiff's Real Estate Agent informed Plaintiff that the

earnest money check would be cashed and held in an account by Corus Realty but was not yet subject to the liquidated damages provision of the purchase agreement.

31.     Plaintiff's Real Estate Agent repeated advice she had given Plaintiff on several occasions over the past few months -- that up to three days after the buyer receives the Condominium Documents (the "Condo Docs") from the seller, the buyer can walk away from a purchase agreement on a Condominium in D.C. without cause and without breaching the purchase agreement (whereas breach would result in forfeiture of the $20,000 in earnest money).

32.     On September 22, 2005, Market Street provided Plaintiff with Good Faith Estimates on two different mortgage options.  Both mortgage options assumed a 5% down payment by Plaintiff, as requested.

33.     Also on September 22, 2005, Plaintiff informed Osborne that Market Street had provided Plaintiff with alternative lending options to CitiMortgage and that Plaintiff would be soliciting additional mortgage lending companies.  Plaintiff informed Osborne that Monday, September 26, 2005, would be the deadline for CitiMortgage to offer competing terms on financing the purchase of the Condominium.

<u>Plaintiff Accepts CitiMortgage's Offer to Finance the Condominium</u>

34.     Late in the afternoon of September 26, 2005, Plaintiff met with Osborne at the Farragut North Citigroup Branch.  At that meeting Osborne presented to Plaintiff a Good Faith Estimate, titled "Truth in Lending Disclosure Statement Preliminary" (the "Sept. 26 GFE").  Ex. 1.

35.     Osborne represented that CitiMortgage could finance the Condominium with a 30-year fixed mortgage at an annual percentage rate of 5.775% with no "points"; however, in order to qualify for these terms, Plaintiff would have to increase his down payment to 10% of the

8

purchase price of the Condominium to "get the deal done" (an additional $33,750 down payment) (the "Sept. 26 Loan").

36.     As part of the Settlement Charges, Osborne represented that Title Insurance would be $1,195.00 through a company called "CapTitle."

37.     Osborne further represented, during a meeting, that Plaintiff had until the close of business of the next day to "get locked in" to the terms contained in the Sept. 26 GFE. Nevertheless at the conclusion of their meeting Plaintiff accepted the terms of the Sept. 26 Loan offered by CitiMortgage and Osborne.

38.     Osborne thanked Plaintiff for choosing Osborne and CitiMortgage to finance the Condominium and indicated that he would begin processing the loan and that nothing further was required to be done on Plaintiff's end. Out of an abundance of caution, Plaintiff advised that he would follow up with an e-mail later that night to confirm their agreement.

39.     On September 26, 2005, at 9:05 p.m. Plaintiff e-mailed Davis of Market Street, "Scott, [t]hank you for all your help and taking the time to get me a Market Street offer but CitiMortgage came with a doc loan at 5.75% (5.77 APR) without an origination fee, etc."

40.     Nine minutes later Plaintiff emailed Osborne, "Larry, [y]ou can go ahead and lock me in for the rate we discussed today – I'll call tomorrow to follow up and discuss the next steps to take[.]"

41.     Reasonably believing that his financing as set forth in the Sept. 26 Loan was now secure, Plaintiff discontinued his search for alternative financing options. Osborne was made aware of such by e-mail.

42.     On or about September 27, 2005, Plaintiff contacted his parents, with whom he had been in touch throughout the process of finding his first home. Plaintiff explained that in

order to get a lower rate without any points on the mortgage Plaintiff had agreed to put down 10% of the purchase price. Plaintiff asked each of his parents to loan and/or gift to him $20,000 each from their General Motors retirement accounts to assist Plaintiff in raising the additional $33,750 in down payment. Plaintiff's parents both agreed to do so. Plaintiff flew home to Wisconsin the weekend of October 14th in order to collect the money from his parents.

43.     On September 27, 2005, Davis of Market Street e-mailed Plaintiff that Davis "[found] it difficult to believe that [Defendant's] offer [sic] [Plaintiff] a 30 year fixed jumbo loan for that rate with no points." Davis included in the same e-mail some "[q]uestions to ask" CitiMortgage regarding the terms of the Sept. 26 Loan to ensure that the CitiMortgage offer was transparent.

44.     Plaintiff forwarded Davis' email to Osborne later that day and requested a response to the concerns and questions Davis raised in his e-mail.

45.     Around noon on September 27, 2005, Plaintiff received the Condo Docs from the seller's real estate agent, Rita Stevens of Zip Realty ("Seller's Real Estate Agent"), thus triggering the 72-hour deadline for Plaintiff to walk away from the transaction for any reason at all without breaching the purchase agreement and forfeiting the $20,000 in earnest money.

46.     On September 28, 2005, Plaintiff delivered a large stack of documents to the Farragut North Citigroup Branch that Osborne had instructed Plaintiff to collect for the CitiMortgage "underwriters" at their September 26, 2005, meeting. Included within a red well full of documents was a copy of Plaintiff's law school diploma, a copy of his offer letter of employment, copies of bank records and pay stubs, a copy of the Condo Docs, a copy of his driver's license, a copy of the earnest money check, a copy of the purchase agreement, and copies of previous year's W-2 forms (collectively the "Closing Documents").

47.    Later that day, Plaintiff's Real Estate Agent e-mailed Plaintiff informing him that Condominium Seller had found a new Condominium to purchase with the proceeds of the sale from the Condominium.

48.    Between September 27, 2005, and September 30, 2005, on several occasions, Osborne confirmed, independently, to both Plaintiff and Plaintiff's Real Estate Agent that the terms of the Sept. 26 Loan were in fact "locked in" and the loan was being processed.

49.    On September 29, 2005, Plaintiff reiterated to Osborne that Plaintiff had until September 30, 2005, at 9 p.m. to walk away from the purchase agreement without consequence and sought reassurance that Osborne had secured the terms of the loan. Osborne confirmed that the terms of the Sept. 26 Loan had been secured and represented to Plaintiff that the loan was processing normally.

50.    Unbeknownst to Plaintiff and Plaintiff's Real Estate Agent at this time, was that Osborne had failed to take the necessary steps to accept the terms of the CitiMortgage offer communicated to Plaintiff on September 26, 2005, and was aware of his failing at all times -- including as he was representing to Plaintiff and Plaintiff's Real Estate Agent on multiple occasions that the loan was secured and in process.

51.    The facts -- as Plaintiff would later learn from Osborne and as evidenced in e-mails provided to Plaintiff by Osborne -- were that Osborne had completely neglected to "file the paperwork" for the loan.

52.    On September 30, 2005, at 9 p.m., Plaintiff allowed the deadline to pass for walking walk away from the purchase agreement, in total reliance on Osborne's representations. From this point forward, if Plaintiff breached the purchase agreement for the Condominium he

would forfeit the $20,000 in earnest money and expose himself to all damages flowing from that breach.

Osborne Causes the Sept. 26 Loan to be Lost

53.    On October 3, 2005, Dan Formosa of CitiMortgage e-mailed Osborne to inform him that the Sept. 26 Loan had not been accepted within the window of time permitted and was thus being declined. Formosa wrote, "Larry – Counter has not been accepted within standard. Loan is being plassed [sic] to uw for decline. Thanks."

54.    On October 6, 2005, three full business days after the e-mail from Formosa, Osborne finally responded to Formosa's October 3 e-mail in an attempt to save the loan, telling Formosa "[Plaintiff] has a contract on this property that has a 10/19/05 closing date! This client also has a $20,000 earnest money deposit on the line on top of it. This now puts me a [sic] grave disadvantage both with the client and his realtor for any future business as well. It also puts the bank at a disadvantage due to the client working for one of our Bank @ Work clients, and having a Citigold account and several other investment accounts with us. Please advise on how to salvage the deal."

55.    Formosa responded by e-mail, "This loan is declined. Tony should have advised you that you have 3-business days to respond to counter/noia's on a go [sic] forward bais [sic]. For future reference, if you do not respond by the end of day 3, the loan will be moved into uw by me for decline. If there are special circumstances, you need to undate in the notes. This is a change in procedure that was communicated by my boss to all of the regional managers. in addition, Tami [Vaughan] sent you an email on 9/26 that you did not respond to. I sent an email to you on 10/3 that went without response. That's why the loan has been declied. Lack of response effects my CIAPPR speed which I am measured by."

12

56.     Later that day Formosa reiterated his earlier position, "It can't be reinstaated [sic] because it has fed as a declined loan. You will have to resub [sic]...there's no other option. The only notes I see from Kevin [Peterson] is on 9/20 which was a suggestion to the UW. Tami [Vaughn] issued counter after receipt of that email on 9/22. From that point on, there is no communication from you regarding the acceptance or decline. I emailed you on 10/3...It's now 10/6."

57.     Osborne wrote back, "Very well. I hope this doesn't delay the processing of this loan, nor impact the tentative approval," to which Formosa replied, "there was no approval of this loan, it was in a counter status and therefore not approved. Resubmit it and email me the account # upon release so I can prioritize. There will be no special rush process granted on this deal."

58.     On October 7, 2005, Osborne resubmitted a loan application to Formosa. (see ¶ 84 *infra*)

59.     On October 11, 2005, Barb Majors of CitiMortgage informed Osborne and Formosa via e-mail that the loan would be approved at "80% LTV with HELOC" and that the "[l]oan would be placed in Counter status for 3 days."

60.     On October 13, 2005, Plaintiff's Real Estate Agent again received assurances from Osborne that the original loan was still intact. After talking to Osborne, Plaintiff's Real Estate Agent e-mailed Plaintiff, "[j]ust talked to Larry [Osborne] and **he said your loan is in underwriting**, so that's a good sign. Said the appraisal came back at $675k, so we don't have any appraisal issues, which is great! Otherwise, I think we're good...We'll get a final settlement statement the day before [closing] (Tuesday [October 18th, 2005]) and I'll call to let you know

what the bottomline [sic] number is for the cashier's check you'll need to bring. Cool?"
(emphasis added)

61.    In fact, since September 26, 2005, Osborne not only failed to communicate the
actual status of Plaintiff's loan to Plaintiff or Plaintiff's Real Estate Agent, but Osborne
continued to falsely represent to Plaintiff and Plaintiff's Real Estate Agent that the Sept. 26 Loan
was secure and in processing.

62.    On the day before the latest counteroffer from CitiMortgage was to expire,
October 14, 2005, and without any communication from Osborne in the interim, Formosa
unilaterally e-mailed Osborne, "I need to know whether counter is accepted by end of business
on this deal. Please advise. If there is no resposne [sic], loan will be passed to uw (?) for decline
at end of day. Also, this has 15-day lock as well."

63.    At 3:15 p.m., an hour before the counteroffer was to expire, Osborne wrote to
Majors and Formosa, "Good afternoon Barb, I am writing to ask if we can switch the 1st
mortgage to an I/O product and still offer the 90% CLTV scenario (combo loan). I have the
copy of the EMD check for verification purposes, the borrower does have at least 5% of [his]
own funds, and is receiving a gift of about 5% as well. My assumption is that with an I/O 1st
mortgage, the DTI will meet guides. At this late stage, asking the borrower to bring roughly
$100,000 to closing is both unreasonable and unattainable. I am willing to work with you to
work out some sort of 90% financing in order to retain this client, but i know that the current
counter is not an option. Also, please be advised that the borrower actually had another offer on
the table before coming to Citi, but since he has a banking relationship with us, **he chose to go
with our initial offer**." (emphasis added)

14

64.    Formosa countered, via e-mail at 3:38 p.m., "Larry – [we] don't look to restructure on the last day of a counter. Do you accept the counter or not?"

65.    After the weekend, on Monday, October 17, 2005, Majors wrote to Osborne and Formosa, "Good afternoon Larry: I have discussed this file with Kevin Peterson (RME) and this is the Final Counter that will be issued for this loan. 1st @ $540,000.00 30 yr fix. 2nd at $50,000.00 fix rate 8.75% to keep DTI under 55%. Please advise if you wish to proceed with this Counter offer. if [sic] you need to speak with me I can be reached at 248-905-7287 or by e-mail. Thank you and have a good afternoon."

### 24-hours from Closing, Osborne Seeks an Additional $17,500 Down Payment

66.    On the morning of October 18, 2005, approximately 24-hours to closing on the Condominium, Osborne called Plaintiff at work. Osborne told Plaintiff that CitiMortgage was "no longer willing" to do the financing with a 10% down payment. Osborne stated that Plaintiff would have to put down an additional 2.5% of the purchase price ($17,500) to get CitiMortgage to finance the purchase of the Condominium. Plaintiff was in absolute shock.

67.    Plaintiff asked Osborne, how, with approximately 24-hours to closing on the Condominium, that CitiMortgage could change the terms of the Sept. 26 Loan that Plaintiff had accepted over three weeks before. Osborne did not offer an explanation nor did he reveal to Plaintiff that through Osborne's own nonfeasance Plaintiff's financing had been lost.

68.    Plaintiff explained to Osborne that Plaintiff had movers scheduled for October 20, 2005, and had reserved the loading dock at the condominium building for a nonrefundable $250. More significantly, if Plaintiff did not close on the Condominium October 19, he would be in breach of the purchase agreement, causing Plaintiff to forfeit the $20,000 in earnest money and

be liable for any damages suffered by the Condominium Seller for the subsequent breach of his purchase agreement on the property that the Condominium Seller was to close on in two days.

69.     At the time, the only near liquid assets Plaintiff had left were his Roth IRA and what little remained of his Citigroup brokerage account. Osborne suggested that Plaintiff contribute those funds to the down payment. Plaintiff told Osborne that he would try to secure the money in time but that he was now doubtful that he would have sufficient funds for closing.

70.     Plaintiff left work immediately after the phone call with Osborne and went across the street to the Farragut North Citigroup Branch. Plaintiff met with a Citigroup representative and discussed his situation. Over the course of the afternoon Plaintiff oversaw the liquidation of his Roth IRA and Brokerage Account and the transfer of the sale proceeds to Plaintiff's checking account. Plaintiff incurred substantial transaction fees not only to liquidate these assets but also to rush the transfer of proceeds into his checking account to be available for closing the next day.

71.     When Plaintiff realized that he was still short he called his law school roommate and asked him to lend Plaintiff $2,000 -- which his friend obliged.

72.     Plaintiff also learned on October 18, 2005, that Osborne had failed to deliver any of the Closing Documents required for closing to the underwriters. At the direction of Formosa and Velma Woodward of CitiMortgage, Plaintiff scanned and e-mailed the required documents directly to the CitiMortgage underwriters, cutting Osborne out of the process. Plaintiff was made aware of several other required documents that Osborne had failed to instruct Plaintiff to collect and thus in haste and at his expense Plaintiff secured and e-mailed these documents directly to the underwriters as well.

73.     On October 18, 2005, at 2:54 p.m. Formosa emailed Osborne that "[a]t this point the closing is truly in jeopardy [sic] because I have no questionnaire and insurance. I need both before I can get approval."

74.     The process of collecting and sending closing documents to the underwriters continued the morning of closing, October 19, 2005, when Woodward made Plaintiff aware of still more documents that Osborne had failed to collect and forward to the underwriters.

## The Day of Closing

75.     Closing on the Condominium was scheduled for October 19, 2005, at 1:30 p.m. but did not actually occur until approximately 5:00 p.m. The closing took place at District Title, located at 1025 Connecticut Avenue, N.W., Suite 1000, Washington, D.C. 20001. The following persons attended: Plaintiff, Plaintiff's Real Estate Agent, Condominium Seller, Seller's Real Estate Agent, Osborne, and Steven M. Sushner of District Title.

76.     At closing, Plaintiff was shown, for the first time, the Settlement Statements and HUD-1 forms containing the terms of loans numbered 002003249223 ("Primary Loan") and 002003272196 ("Secondary Loan"). Exs. 2, 3.

77.     Plaintiff immediately recognized several inconsistencies between the terms of the Primary Loan and Secondary Loan the terms Plaintiff had agreed to on September 26, 2005.

78.     Line 801 of the Primary Loan, "Loan Origination Fee," contained an origination fee of one-eighth of one point on the principal of the loan. The assessment of this fee was never discussed or disclosed with Plaintiff either verbally, in writing, or specifically in the Sept. 26 GFE or at any other point.

17

79.    When confronted about Line 801, Osborne admitted that a Loan Origination Fee had not been agreed to nor should it have been assessed on the Primary Loan, that it was his fault, and that after closing he would remedy the situation.

80.    Line 1108 of the Primary Loan, indicated "Title Insurance" of $2,246.20. Line 1108 of the Sept. 26 GFE listed $1,195.00 for "Title Insurance." Between September 26, 2005, through the time of closing Plaintiff had confirmed this figure with Osborne; yet at closing the actual amount was $1,051.20 or over twice the "estimated" amount.

81.    Osborne had represented to Plaintiff that the subordinate financing, i.e. the Secondary Loan, would be a HELOC. Upon examining the Secondary Loan, Plaintiff discovered that, in fact, the loan was a Fixed Rate Home Equity Loan ("FRHEL"). Closing was the first time that Plaintiff was informed that the Secondary Loan on the Condominium would be a FRHEL. Likewise Plaintiff had seen any documentation on the Secondary Loan nor been notified of the interest rate or fees associated with the Secondary Loan.

82.    Among the closing documents, the NOTE indicated a "yearly [interest] rate of 5.875". This interest rate differed significantly from the interest rate agreed to in the Sept. 26 Loan, which was 5.775%. Ex. 4

83.    When confronted with the discrepancy in the interest rates, Osborne stated that he was unaware of the terms of the Primary Loan. When confronted with the Sept. 26 GFE Osborne stated that there was a period of time after closing in which adjustments could be made to the Primary and Secondary Loans and that Osborne would correct the discrepancies on both loans. Osborne spent several minutes on his cellular telephone and then returned to the closing room. In front of all parties in attendance at the closing Osborne admitted fault for the discrepancies.

84.     Also among the settlement documents was a copy of a "Truth in Lending Disclosure Statement" that indicated an "Annual Percentage Rate" of 5.912% (the "Oct. 7 GFE"). The statement was dated October 7, 2005 (see ¶ [56] *supra*), and indicated that "[t]his application was taken by:" to which Osborne had fraudulently checked "face-to-face interview." In fact, no meeting between Plaintiff and Osborne had taken place that day, and Osborne never disclosed the existence of this document to Plaintiff. Plaintiff had never seen this document before the closing. Ex. 5.

85.     Plaintiff inquired with Sushner of District Title if Plaintiff could indicate his disagreement as to the discrepancies of the loans on the face of the closing documents. Sushner stated that Plaintiff could not.

86.     Plaintiff closed on the Condominium at or around 5:00 p.m. on October 19, 2005.

The Aftermath

87.     Beginning immediately after closing and continuing over the next two weeks, Plaintiff made continuous attempts to schedule a meeting with Osborne to address and resolve the issues that had arisen before and during closing.

88.     After at least one cancelled meeting and many unreturned phone calls, Plaintiff finally tracked Osborne down at the Farragut North Citigroup Branch by dropping by unannounced on November 7, 2005.

89.     Plaintiff asked Osborne to fully explain how the terms of his Primary and Secondary Loans differed from the terms of his Sept. 26 Loan.

90.     Osborne took responsibility and blame for the entire situation. Osborne admitted that he had failed to turn in Plaintiff's loan paperwork within the time allowed by CitiMortgage to secure the terms of the loan.

91.    Osborne then printed directly from his computer several e-mails that Osborne stated more fully explained what had gone wrong.  Osborne turned those e-mails over to Plaintiff.

92.    Osborne reiterated that he would take the steps necessary to conform the terms of the Primary and Secondary Loan to those of the Sept. 26 Loan.

93.    Over the next five weeks Plaintiff left many unreturned phone calls with Osborne and stopped by the Farragut North Citigroup Branch many times without success in an effort to check on Osborne's progress.

94.    Unable to reach Osborne, Plaintiff obtained the contact information for Osborne's manager at CitiMortgage, Reginald Moore.  During a phone conversation on or about December 13, 2005, Plaintiff recounted to Moore his experience with Osborne and the discrepancies with his loans.  Moore stated on the phone that he had "inherited that headache" (referring to Osborne) from another CitiMortgage manager and that Plaintiff was not the only one that had complained about Osborne.  Moore made other comments that led Plaintiff to believe that Plaintiff's nightmarish experience with Osborne was not unique.

95.    Upon information and belief, Osborne was fired from CitiMortgage within months of Plaintiff's Condominium closing.

96.    Plaintiff spent the next five months diligently and in good faith attempting to settle the above captioned matter with CitiMortgage without success.

## COUNT I
### Fraud

97.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 - 96 of this Complaint as if fully restated herein.

98.    On many occasions Osborne made false representations to Plaintiff and Plaintiff's Real Estate Agent, including but not limited to:

    a.    Beginning on September 26, 2005, and again on many instances up until closing, Osborne represented that the terms of the Sept. 26. Loan were secure and the loan was in processing;

    b.    On or about October 13, 2005, Osborne represented that Plainitff's loan was in processing;

    c.    On October 18, 2005, Osborne misrepresented the actual reason that Plaintiff would have to put an additional 2.5% down payment towards the purchase of the Condominium;

    d.    Fundamentally, Osborne misrepresented the eventual terms of Plaintiff's Primary Loan including origination points, the interest rate, and the down payment;

    e.    Osborne falsely represented on the Oct. 7 GFE that Plaintiff was aware of the document and had been at a "face-to-face" interview with Osborne regarding the document; and

    f.    Osborne represented to Plaintiff at closing that he would, and could, change the terms of Plaintiff's Primary and Secondary Loans to those that had previously been agreed to on September 26, 2006 and embodied in the Sept. 26 Loan.

99.    Likewise, through his nondisclosure, omission and continuous silence from September 26, 2005, through closing on October 19, 2005, Osborne failed to inform Plaintiff that the terms of his loan would not be those of the Sept. 26 Loan that Plaintiff had agreed to.

100.    The false representations and omissions by Osborne were in reference to material facts. Those facts include but are not limited to:

a.  the terms of the Sept. 26 Loan including the interest rate, points on the loan, the down payment, and the Title insurance;

b.  the terms of the Primary Loan including the interest rate, points on the loan, the down payment, and the Title insurance; and

c.  the financial product used for the Secondary Loan, a HELOC versus FRHEL;

d.  Osborne's ability to effect a revision of Plaintiff's Primary and Secondary Loans;

e.  an increase in Plaintiff's down payment the day before closing in the amount of $17,500; and

f.  the actual status of the Sept. 26 Loan.

101.   Osborne was well aware of the falsity of his representations to Plaintiff. Osborne knew that he had failed to turn in the paperwork for the Sept. 26 Loan because he was the individual who actually failed to turn in the paperwork.  Formosa made Osborne aware on October 3, 2005, that the Sept. 26 Loan had been declined yet Osborne continued to falsely represent -- as he tried over the next two weeks to clean up his mistake -- to Plaintiff and Plaintiff's Real Estate Agent that the Sept. 26 Loan was processing normally.

102.   Osborne intentionally deceived Plaintiff and Plaintiff's Real Estate Agent by making false representations regarding the terms of Plaintiff's loans.  At the same time that Osborne was working behind the scenes with the CitiMortgage underwriters on securing inferior financing terms Osborne continued to misrepresent and omit the true nature of the situation to Plaintiff and Plaintiff's Real Estate Agent.  Osborne did so to avoid responsibility for the situation and avoid getting into further trouble with his superiors at CitiMortgage and Citigroup.

103.   Plaintiff believed that he had secured the terms of the Sept. 26 Loan on September 26, 2005, and acted in reliance on Osborne's misrepresentations from that day forward until

22

closing. Plaintiff ceased looking for mortgage financing and the very evening of September 26, 2005, canceled his loan application with Davis of Market Street, something Osborne was aware of.

104. If Plaintiff had not secured the terms of the Sept. 26 Loan (or terms as favorable from another lender) Plaintiff would not have gone forward with the purchase of the Condominium, and instead would have "walked away" before the expiration of the 3-day Condominium Documents window on September 30, 2005.

105. Plaintiff also made numerous other arrangements in reliance on Osborne's statements and contingent on purchasing and moving into the Condominium, including but not limited to: an interstate move; a nonrefundable condominium building move-in fee; loss of other housing opportunities; setting up utilities and cable; taking time off from work; receiving money from his parents, and changing his mailing address.

106. Plaintiff's reliance on Osborne's representations was reasonable. Citigroup is listed eighth on the list of Fortune 500 companies and is a widely respected banking institution. Relying on Citigroup's reputation in combination with a long personal banking relationship, Plaintiff solicited Citigroup's subsidiary CitiMortgage, located within a Citigroup branch, for an offer to finance the purchase of Plaintiff's first home. Plaintiff trusted the Citigroup and CitiMortgage brand name and thus extended that trust to CitiMortgage Lending Agent Osborne, who was cloaked in the goodwill and reputation of Citigroup and CitiMortgage.

## COUNT II
### Negligent Misrepresentation

107. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 - 106 of this Complaint as if fully restated herein.

23

108.    On many occasions Osborne made false statements or omissions of fact to Plaintiff and Plaintiff's Real Estate Agent, including but not limited to those detailed in ¶¶ 98-99.

109.    Osborne's false statement and/or omissions were in violation of his duty to exercise reasonable care. The duty of reasonable care requires that those with special training and experience adhere to a standard of conduct commensurate with such attributes. Osborne was a CitiMortgage Lending Agent with special training and experience in the mortgage lending industry.

110.    Osborne violated his duty to Plaintiff to exercise reasonable care when he failed to process Plaintiff's Sept. 26 Loan. Osborne further violated his duty to Plaintiff to exercise reasonable care when he knowingly made misleading representations, half truths, and material omissions of fact to Plaintiff in the course of their business relationship.

111.    Osborne's false statements and/or omissions involved material issues including but not limited to those detailed in ¶ 100.

112.    Plaintiff reasonably relied on the false information from Osborne, see ¶ 106.

113.    Plaintiff relied to his detriment on Osborne's false information, changing his position in reliance on Osborne's statements and as a result suffering both financial and emotional injury.

114.    Osborne's false statements and material omissions proximately caused injury to the Plaintiffs in the following ways, including but not limited to:

a.    The loss of certain capital that was otherwise taken up by an additional 2.5% down payment;

b. Plaintiff has suffered and continues to suffer financial injury from a higher than bargained for interest rate on his Primary Loan, or approximately $20,000 in additional interest over the life of the loan;

c. Any loss in market value to the Condominium since the date of closing given that, in reliance of Osborne's false statement and/or omissions, Plaintiff would have walked away from the purchase of the Condominium had he not believed that the terms of the Sept. 26 Loan were secure;

d. Fees associated with the rushed liquidation of Plaintiff's Roth IRA and Citibank brokerage;

e. Mental pain and suffering associated with the stress and anxiety caused by Osborne's actions and inactions;

f. The investment loss of equities that were caused to be sold for an additional 2.5% down payment;

g. The investment and tax loss on the liquidation of Plaintiff's IRA;

h. The money it cost to secure documents for the CitiMortgage underwriters the day before and day of closing; and

i. Increased closing costs, namely Title Insurance over twice the estimate quoted by Osborne in the Sept. 26 GFE.

115.    The harm resulting from Osborne's actions were reasonably able to be predicted, as Osborne could have foreseen that failing to secure Plaintiff's Sept. 26 Loan and subsequently failing to disclose that fact (and in fact misrepresenting just the opposite) would cause the Plaintiff harm.

## COUNT III
### Negligent Infliction of Emotional Distress

116.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 – 115 of this Complaint as if fully restated herein.

117.    Osborne's conduct was extreme and outrageous given the facts of the situation. Osborne was aware that he was doing business with a young, inexperienced, first-time home buyer; that the transaction involved a significant amount of money; and that the consequences of his misdeeds would cause injury to Plaintiff.

118.    Osborne was reckless in his conduct, failing to exercise the level of care required of a mortgage lending professional in his position.  Osborne purposefully acted to deceive Plaintiff with reckless disregard for the consequences.

119.    Plaintiff has suffered severe emotional distress as a result of Osborne's actions. The stress and anxiety caused by Osborne's misdeeds are serious and verifiable, and including loss of sleep, loss of appetite, and difficulty focusing at work.

## COUNT IV
### Negligent Hiring, Training, Supervision, and/or Retention

120.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 - 119 of this Complaint as if fully restated herein.

121.    Citigroup and CitiMortgage knew or should have know that Osborne behaved in an incompetent manner.

122.    Moore, Osborne's boss, admitted to Plaintiff during a telephone conversation on or about December 13, 2005, that Osborne had been a "headache" for CitiMortgage and that Plaintiff was not he only one that had complained about Osborne.

123.    Given the high-stakes nature of Osborne's position, the absolute trust home buyers are forced to place in the lending agent's hands, and the position of trust afforded their lending agents as employees under the "Citigroup umbrella," Citigroup and CitiMortgage should have more adequately trained Osborne, supervised his work product, responded to complaints and concerns, and when his incompetence became clear, terminated his employment.

124.    Armed with that actual and/or constructive knowledge of Osborne's incompetence, Citigroup and CitiMortgage failed to adequately supervise Osborne and/or terminate Osborne at the appropriate time.

## COUNT V
## Professional Malpractice

125.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 – 124 of this Complaint as if fully restated herein.

126.    Osborne had a duty to use such skill, prudence, and diligence that other members of his profession commonly posses and exercise.

127.    Osborne breached that duty to Plaintiff by defrauding, negligently misrepresenting, and omitting material facts relevant to Plaintiff's financing to purchase the Condominium.

128.    There exists a proximate causal connection between Osborne's negligent conduct and the resulting injury to the Plaintiff.

129.    Actual loss or damage resulted from the Osborne's malpractice.

## COUNT VI
### Negligence

130.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 - 129 of this Complaint as if fully restated herein.

131.    Osborne's conduct was in violation of his duty to exercise reasonable care with Plaintiff.

132.    The duty of reasonable care requires that those with special training and experience adhere to a standard of conduct commensurate with such attributes.

133.    Osborne breached that duty of care through his various nonfeasances, false statements, and material omissions directed at Plaintiff, thus violating the applicable standard of care.

134.    Osborne's violation of his duty to exercise reasonable care with Plaintiff was causally related to the harm to Plaintiff complained of.


## COUNT VII
### Conversion

135.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 - 134 of this Complaint as if fully restated herein.

136.    The tort of conversion involves an unlawful exercise of ownership, dominion and control over the personalty of another in denial or repudiation of his right to such property.

137.    Defendants exercised ownership, dominion and control over a measure of Plaintiff's money though a series of unlawful acts. These acts include:

a.  Surprising Plaintiff the day before the schedule to obtain a extract a larger down payment from Plaintiff in order to shift risk when they knew Plaintiff lacked meaningful choice or bargaining power;

b.  Extracting fees for the sale of securities that were necessitated by their own unlawful acts;

c.  Failing to refund, amend, or revise Plaintiff's Primary Loan to reflect the terms of the Sept. 26 Loan;

d.  Collecting interest or fees not contracted for under the terms of the Sept. 26 Loan.

**COUNT VIII**
**Violations of the District of Columbia Consumer Protection Act ("CPPA")**
**D.C. Code Section 28-3901, et seq.**

138.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 - 137 of this Complaint as if fully restated herein.

139.    The Defendants' acts of soliciting Plaintiff's business, brokering a loan to Plaintiff, lending Plaintiff money and taking a security interest in Plaintiff's property, constitute "trade practices" that are regulated by and are within the meaning of CPPA.

140.    It is a violation of D.C. Code Section 28-3904 for an person to:

Represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have (subsection (a));

Represent that the person has a sponsorship, approval, status, affiliation, certification, or connection that the person does not have (subsection (b));

Represent that goods or services are of a particular standard, grade, style or model, if in fact they are of another (subsection (d));

29

Misrepresent a material fact which has a tendency to mislead (subsection (e));

Fail to state a material fact if such failure tends to mislead (subsection (f));

Fail to supply to a consumer a copy of a sales or service contract or other evidence of indebtedness which the consumer may execute (subsection (g));

Falsely state that services, replacement or repairs are needed (subsection (k));

Make or enforce unconscionable terms or provisions of sales or leases (subsection (r)), with factors indicating unconscionable terms include, among other things the" knowledge by the person at the time credit sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer;" (subsection (r)(1));

Represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not (subsection (u));

Misrepresent the authority of a salesmen, representative or agent to negotiate the final terms of a transaction (subsection (v)); or

Sell consumer goods in a condition or manner not consistent with that warranted by operation or requirement of D.C. Code Sections 28:2-313 to 28:3-318, or federal law (subsection (x)).

141.    Courts have also held that violations of other laws of the District of Columbia may be a violation of the CPPA. (subsection (f))

142.    The Defendants violated the CPPA in numerous ways, including, but not limited to, the following;

    a.  With respect to subsection (d), Osborne represented to Plaintiff that his Primary and Secondary Loans would contain the terms of the Sept. 26 Loan, when in fact, they did not and Osborne was aware that they would not;

b.  With respect to subsection (e), Osborne mislead Plaintiff as material terms of his Primary and Secondary Loans, representing to Plaintiff that those loans would contain the terms of the Sept. 26 Loan, including *inter alia*, the interest rate, the down payment, points assessed on the loan principal, and the title insurance;

c.  With respect to subsection (f), Osborne failed to disclose to Plaintiff the true status of the Sept. 26 Loan, even when prompted, until the day before and the day of closing, and even then made material false misrepresentations, all of which caused the Plaintiff to change his position to his detriment and injury;

d.  With respect to subsection (k), Osborne falsely represented that points and title insurance of a certain amount were needed when they were in fact not;

e.  With respect to subsection (q), the Defendants failed to provide Plaintiff with proper written disclosures as required by various state and federal laws;

f.  With respect to subsection (r), Defendants had Plaintiff sign documents that had unconscionable terms, with full knowledge of what had been agreed to in the Sept. 26. Loan and the precarious financial position, given their intimate knowledge of Plaintiff's finances, the terms of the Primary and Secondary Loans would put Plaintiff in;

g.  With respect to subsection (u), Osborne represented to Plaintiff that the Sept. 26 Loan had been secured, was in processing, and with the underwriters, when in fact, it was not;

h.  With respect to subsection (v), Osborne made representations to Plaintiff on which Plaintiff relied that Osborne had the authority to extend the terms of the Sept. 26 Loan to Plaintiff and register acceptance of that offer; and

31

**i.** With respect to subsection (x), Defendants violated state and federal consumer protection laws, as described above and in the following counts of the complaint.

143. Specifically Defendant's violated the disclosure provisions of TILA (discussed infra) and the Real Estate Settlement Procedures Act ("RESPA") 12 USC 2601, et. seq. and the regulations promulgated thereunder, 24 C.F.R. § § 3500, et. seq.

144. Due to the Defendants' violations of the CPPA, Plaintiff is entitled to statutory, treble and/or punitive damages, attorney's fees and any other relief this court deems proper.

## COUNT IX
### Violations of the Truth In Lending Act ("TILA")
### 15 U.S.C. § 1638

145. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 - 144 of this Complaint as if fully restated herein.

146. 15 U.S.C. 1638(b)(1) of the Truth in Lending Act requires the following disclosures to be made before the credit is extended: the "amount financed," as described in 15 U.S.C. Section 1638(a)(2)(A); the "finance charge," as described in 15 U.S.C. Section 1638(a)(3) and Federal Reserve Board Regulation, 12 C.F.R. Sections 226.4 and 226.18(d) ("Regulation Z"), Sections 226.4; and the "annual percentage rate," as described in 15 U.S.C. Section 1638(a) and Regulation Z, Section 226.18(e).

147. 15 U.S.C. 1638(b)(2) of the Truth in Lending Act requires that "good faith estimates of the disclosures required under subsection (a) of this section shall be made in accordance with regulations of the Board under section 1631(c) of this title before the credit is extended, or shall be delivered or placed in the mail not later than three business days after the creditor receives the consumer's written application, which ever is earlier. If the disclosure statement furnished within three days of the written application contains an annual percentage

rate which is subsequently rendered inaccurate within the meaning of section 1606(c) of this title, the creditor shall furnish another statement at the time of settlement or consummation," as applied and interpreted by Regulation Z."

148.    Defendants, through their agent Osborne, violated the Truth in Lending Act by failing to comply with the disclosure requirements in numerous ways, including but not limited to the following:

    a.    Providing inaccurate finance charge, amount financed and APR disclosures;

    b.    Untimely disclosures of for the Primary and Secondary Loans;

    c.    Insufficient disclosures and misrepresentations related to the Sept. 26 GFE; and

    d.    Submission of the fraudulent Oct. 7 GFE and nondisclosure of such.

149.    Pursuant to 15 U.S.C. 1640, Plaintiff is entitled to recover the appropriate civil penalty, plus the costs and reasonable attorneys fees, and any other relief this Court deems proper.

### COUNT X
### Violations of the Usury Statute
### D.C. Code Section 28-3301, et seq.

150.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 - 149 of this Complaint as if fully restated herein.

151.    D.C. Code Section 28-3301(f) of the Usury Statute states that a lender, in a loan or financial transaction which is secured by a deed of trust on residential property, must furnish the borrower a separate statement in writing which complies with the disclosure provisions of the TILA, as applied and interpreted by Regulation Z.

152.    At all terms relevant hereto, Defendants extended to or offered to extend consumer credit for which a finance charge is or may be imposed or which by written agreement,

33

is payable in more than four installments, and is the person to whom the transaction which is the subject of the cause of action is initially payable, making these defendants a creditors within the meaning of TILA and Regulation Z, Section 226.2 (a)(17).

153.    Section 1638(b)(1) of the TILA requires the following disclosures to be made before the credit is extended: the "amount financed," as described in 15 U.S.C. Section 1638 (a) (2) (A); the "finance charge," as described in 15 U.S.C. Section 1638 (a) (3) and Regulation Z, Sections 226.4 and 226.18 (d); and the "annual percentage rate," as described in 15 U.S.C. Section 1638(a) and Regulation Z, Section 226.18 (e).

154.    Citigroup and CitiMortgage, though its Lending Agent Osborne, violated the Usury Statute by failing to comply with its TILA disclosure requirements in numerous ways, including, but not limited to those detailed in ¶ 148 and elsewhere.

155.    The Defendants' failures to comply with D.C. Code Section 28-3301 were intentional, willful and wanton, and justify the imposition of punitive damages.

156.    Pursuant to D.C. Code Sections 28-3314, Plaintiff is entitled reasonable attorneys fees, actual and punitive damages, and any other relief this Court deems proper.

### COUNT XI
### Unconscionability
### D.C. Code Section 28:2-302

157.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 - 156 of this Complaint as if fully restated herein.

158.    In the District of Columbia, a contract is unconscionable if there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to another party.

159.    Defendants CitiMortgage and their lending agent Osborne held itself out to the general public and to Plaintiff in particular as an expert in the field of loan financing and as a business ready willing and able to assist individuals seeking financing.

160.    Plaintiff met with Osborne as an employee of CitiMortgage with the reasonable belief that these Defendants could loan him money on terms that would improve his current financial situation. Plaintiff has little knowledge or expertise in the area of loan financing and as of October 18, 2005, had no bargaining power in his contracting with Defendants.

161.    Defendant's were aware of Plaintiff's delicate financial situation.

162.    With this knowledge Defendants surprised Plaintiff with loan terms the day before and the day of closing that, given the timing of the disclosure and Plaintiff's legal and financial obligation under purchase agreement, rendered Plaintiff without meaningful choice.

163.    In fact, Plaintiff's only choice was to, with Osborne's assurances that the Primary and Secondary Loans would be revised, proceed with closing and mitigate his damages.

164.    Due to the procurement of an unconscionable loan agreement by the Defendants Ms. Johnson is entitled to have compensatory damages paid to her pursuant to D.C. Code Sec. 28:302

WHEREFORE, Plaintiff requests judgment against the Defendants and award such damages as may be proved at trial; grant costs and expenses, including attorney's fees; compensatory, treble and punitive damages; statutorily available monetary damages; equitable revision of terms of the Primary Loan to those of the Sept. 26 Loan, and for such further relief as this Court deems just and proper.

JURY DEMAND

DATE:  OCTOBER 18, 2006


Respectfully submitted,

By: _____

Scott D. Pluta
777 7th Street N.W. #414
Washington, D.C. 20001
(434)-242-1615

**TRUTH IN LENDING DISCLOSURE STATEMENT PRELIMINARY**
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Applicant: Scott D. Pluta
1702 Rugby Ave.
Charlottesville, VA 22903

Lender: CitiMortgage, Inc.

Loan No: 002003200631

Property: Pre-Approval
Washington, DC 20599

Type of Loan: Conventional
Date: September 26, 2005
Disclosure Type: Preliminary

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 5.775%e | $ 597,063.71e | $ 537,404.09e | $ 1,134,467.80e |

REPAYMENT: See Payment Schedule below.

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|---|---|---|
| 359 | 3,151.29e | Monthly beginning 12/01/2005e | | | |
| 1 | 3,154.69e | Monthly beginning 11/01/2035e | | | |

DEMAND FEATURE: [X] This loan does not have a Demand Feature.    [ ] This loan has a Demand Feature as follows:

REQUIRED DEPOSIT: [X] The annual percentage rate does not take into account your required deposit.

VARIABLE RATE FEATURE: [ ] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at:     Pre-Approval
Washington, DC 20599

ASSUMPTION: Someone buying this property [X] cannot assume the remainder of the mortgage on the original terms
[ ] may assume, subject to conditions, the remainder of the mortgage on the original terms.

NON-FILING INSURANCE: $ N/A

PROPERTY INSURANCE: [X] Homeowner's insurance, or fire and extended coverage, is a required condition of this loan. Also, if the property securing this loan is located in a flood hazard area, you will be required to obtain flood insurance. Borrower may purchase this insurance from any insurance company acceptable to lender.

LATE CHARGES: If a payment is more than 15 days late, you will be charged a late charge of 5.000% of the payment.

PREPAYMENT: If you pay off your loan early, you
[ ] may  [X] will not    have to pay a prepayment penalty.
[ ] may  [X] will not    have to pay a minimum finance charge.
[ ] may  [X] will not    be entitled to a refund of part of the finance charge.

See your contract documents for any additional information about non-payment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

e means an estimate - All dates and numerical disclosures except for late payment disclosures are estimates.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____
BORROWER/DATE

Scott D. Pluta    _____
BORROWER/DATE

_____
BORROWER/DATE

_____
BORROWER/DATE

150003 - 07/22/2002    [002003200631]
CitiMortgage 2.9.1.30

00200320063<sub></sub>

002003200631

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (if additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | Totals | $ | $ | $ | $ | $ | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

| VII. DETAILS OF TRANSACTION | | VIII. DECLARATIONS |
|---|---|---|

| | | | If you answer "Yes" to any questions a through i, please use continuation sheet for explanation. | Borrower | | Co-Borrower | |
|---|---|---|---|---|---|---|---|
| | | | | Yes | No | Yes | No |
| a. | Purchase price | $ 675,000.00 | a. Are there any outstanding judgments against you? | | X | | |
| b. | Alterations, improvements, repairs | | b. Have you been declared bankrupt within the past 7 years? | | X | | |
| c. | Land (if acquired separately) | | c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | |
| d. | Refinance (incl. debts to be paid off) | | d. Are you a party to a lawsuit? | | X | | |
| e. | Estimated prepaid items | 1,855.91 | e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or V.A. case number, if any, and reasons for the action.) | | X | | |
| f. | Estimated closing costs | 10,155.00 | | | | | |
| g. | PMI, MIP, Funding Fee | | | | | | |
| h. | Discount (if Borrower will pay) | | | | | | |
| i. | **Total costs** (add items a through h) | 687,010.91 | | | | | |
| j. | Subordinate financing | 67,500.00 | f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | X | | |
| k. | Borrower's closing costs paid by Seller | | | | | | |
| l. | Other Credits (explain) | | g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | |
| | | | h. Is any part of the down payment borrowed? | | X | | |
| | | | i. Are you a co-maker or endorser on a note? | | X | | |
| | | | j. Are you a U.S. citizen? | X | | | |
| | | | k. Are you a permanent resident alien? | | X | | |
| | | | l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | | |
| m. | Loan amount (exclude PMI, MIP, Funding Fee financed) | 540,000.00 | m. Have you had an ownership interest in a property in the last three years? | | X | | |
| n. | PMI, MIP, Funding Fee financed | | (1) What type of property did you own - - principal residence (PR), second home (SH), or investment property (IP)? | | | | |
| o. | Loan amount (add m & n) | 540,000.00 | (2) How did you hold title to the home - - solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | | | |
| p. | Cash from to Borrower (subtract j, k, l & o from i) | 79,510.91 | | | | | |

## IX. ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by the mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) any owner or servicer of the Loan may verify or reverify any information contained in the application from any source named in this application, and Lender, its successors or assigns may retain the original and/or an electronic record of this application, even if the Loan is not approved; (7) the Lender and its agent, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property, and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling, in order to monitor the Lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a Lender may neither discriminate on the basis of this information, nor on whether you choose to furnish it. However, if you choose not to furnish it, under Federal regulations this Lender is required to note race and sex on the basis of visual observation or surname. If you do not wish to furnish the above information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the Lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information | CO-BORROWER | ☐ I do not wish to furnish this information |
|---|---|---|---|
| **Ethnicity:** | ☐ Hispanic or Latino   ☒ Not Hispanic or Latino | **Ethnicity:** | ☐ Hispanic or Latino   ☐ Not Hispanic or Latino |
| **Race:** | ☐ American Indian or Alaskan Native   ☐ Asian   ☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander   ☒ White | **Race:** | ☐ American Indian or Alaskan Native   ☐ Asian   ☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander   ☐ White |
| **Sex:** | ☐ Female   ☒ Male | **Sex:** | ☐ Female   ☐ Male |

| To be Completed by Interviewer | Interviewer's Name (print or type) | Name and Address of Interviewer's Employer |
|---|---|---|
| This application was taken by: | Larry Osborne | CitiMortgage, Inc. |
| ☒ face-to-face interview | Interviewer's Signature | |
| ☐ Mail | | Date 09/14/05 | 1000 Technology Drive |
| ☐ Telephone | Interviewer's Phone Number (incl. area code) | O'Fallon, MO 63304- |
| ☐ Internet | (301) 537-9037 | |

## GOOD FAITH ESTIMATE OF SETTLEMENT COSTS
### (Continued)

**THIS SECTION TO BE COMPLETED BY LENDER ONLY IF**
**A PARTICULAR PROVIDER OF SERVICE IS REQUIRED**

Listed below are providers of service which we require you to use. The charges indicated in the Good Faith Estimate above are based upon the corresponding charges of the providers designated below.

**Appraiser**
We will select an Appraiser from our approved list of certified appraisers. The range of costs for this service is provided in the itemization of Estimated Loan Costs listed on the first page of your Good Faith Estimate.

**Attorney/Closing Agent**
We will select an Attorney/Closing Agent from our approved list of attorneys/closing agents. The range of costs for this service is provided in the itemization of Estimated Loan Costs listed on the first page of your Good Faith Estimate.

**Credit Bureaus**
Trans Union Corporation
Consumer Services Division 760 Sproul Road, P.O. Box 390
Springfield, PA  19064-0390
Phone No:(800) 916-8800

EXPERIAN
701 Experian Parkway P.O. Box 949
Allen, TX  76013-0949
Phone No:(800) 333-4930
Experian was a depositor of Citibank, F.S.B. in the past 12 months.

Equifax Credit Information Services
1150 Lake Hearn Drive, Suite 4
Atlanta, GA  30342
Phone No:(800) 685-1111

Equifax Mortgage Information Services
6 East Clementon Road
Gibbsboro, NJ  08026
Phone No:(800) 333-0037

**Mortgage Insurers**
We will select a Mortgage Insurer from our approved list of Mortgage Insurance Companies. The range of costs for this service is provided in the itemization of Estimated Loan Costs listed on the first page of your Good Faith Estimate.

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property.

**PRIOR TO SIGNING BELOW, APPLICANT(S) READ THIS GOOD FAITH ESTIMATE OF SETTLEMENT COSTS AND UNDERSTOOD ITS CONTENTS.**

**APPLICANT(S):**

X _____         Date: _____
  Scott D. Piuta

X _____         Date: _____

X _____         Date: _____

X _____         Date: _____

X _____         Date: _____
  Authorized Official

GFECX - 03/01/2002    [002003200631]
CitiMortgage 2.9.1.30

# GOOD FAITH ESTIMATE OF SETTLEMENT COSTS

| Applicant: | Scott D. Pluta | Lender: | CitiMortgage, Inc. |
|---|---|---|---|
| | 1702 Rugby Ave. | | 1000 Technology Drive |
| | Charlottesville, VA  22903 | | O' Fallon, MO  63368-2240 |

Application No:  002003200631

| Property: | Pre-Approval | Loan Type: | Conventional |
|---|---|---|---|
| | Washington, DC  20599 | Date: | 09/26/2005 |
| | | Mortgage Amount: | $ 540,000.00 |
| | | Estimated Interest Rate: | 5.750% |

The information provided below reflects estimates of the charges which you are likely to incur at settlement of your loan. The fees listed are estimates - the actual charges may be more or less. Your transaction may not involve a fee for every item listed. The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A Settlement Statement which you will be receiving at settlement. The HUD-1 or HUD-1A Settlement Statement will show you the actual cost for items paid at settlement. Items marked "(p.o.c.)" were or will be paid outside the closing, they are shown here for information purposes and are not included in the totals.

| Description of Settlement Charges | | BUYER | LENDER |
|---|---|---:|---|
| 0205. | Lender Paid Credit | -500.00 | |
| 0808. | Commitment Fee | 565.00 | |
| 0812. | Application Fee | 500.00 | |
| 0901. | Interim Interest 13 days @ $85.07 per day | 1,105.91 | |
| 1004. | County Property Tax Escrow 3 payments @ $250.00 per payment | 750.00 | |
| 1101. | Settlement or Closing Fee | 425.00 | |
| 1102. | Abstract or Title Search | 300.00 | |
| 1104. | Title Insurance Binder | 45.00 | |
| 1108. | Title Insurance | 1,195.00 | |
| 1201. | Recording Fees | 150.00 | |
| 1202. | City/County Tax/Stamps | 7,425.00 | |
| 1302. | Pest Inspection | 50.00 | |
| | Total | $  12,010.91 | $ |

**A.** Settlement Statement

**B. Type of Loan**

U.S. Department of Housing and Urban Devel
OMB Approval No. 2502-0265 (expires 9/30/2006)    FINAL

| 1. ☐FHA | 2. ☐FmHA | 3. ☒Conv. Unins. | 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case Number |
|---|---|---|---|---|---|
| 4. ☐VA | 5. ☐Conv. Ins. | | 05-496 | 0020032402223 | |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c)" were paid outside the closing; they are shown here for information purposes and are not included in the totals.
WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

TitleExpress Settlement System
Printed 10/19/2005 at 15:39 JJC

**D. NAME OF BORROWER:** Scott Pluta
ADDRESS:

**E. NAME OF SELLER:** Victor L. Vacanti
ADDRESS:

**F. NAME OF LENDER:** CitiMortgage, Inc.
ADDRESS: 1000 Technology Drive, O'Fallon, MO 63368-2240

**G. PROPERTY ADDRESS:** 777 7th Street, N.W., #414, Washington, DC 20001
Lot 2019, Square 0455
☐ Principal Residence    ☐ Other Real Estate

**H. SETTLEMENT AGENT:** District Title, A Corporation, Phone 202-518-9300 Fax 202-518-9301
PLACE OF SETTLEMENT: 1026 Connecticut Avenue, NW, Suite 1000, Washington, DC 20036

**I. SETTLEMENT DATE:** 10/19/2005

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract sales price | 675,000.00 | 401. Contract sales price | 675,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 13,463.16 | 403. | |
| 104. 11/05 Condo Fee | 600.69 | 404. | |
| 105. New Owner Set Up Fee | 50.00 | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. Assessments    10/19/05 to 10/31/05 | | 406. Assessments    10/19/05 to 10/31/05 | 256.84 |
| 109. | 256.84 | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 689,370.69 | **420. GROSS AMOUNT DUE TO SELLER** | 675,256.84 |
| **200. AMOUNTS PAID BY OR ON BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201. Deposit or earnest money | 20,000.00 | 501. Excess Deposit (see instructions) | |
| 202. Principal amount of new loans | 540,000.00 | 502. Settlement charges to seller (line 1400) | 41,716.50 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Second Mortgage Proceeds | 50,000.00 | 504. Payoff:6917367879 | 354,367.81 |
| CitiMortgage, Inc. | | Bank of America | |
| 205. Misc. Credit | 1,500.00 | 505. | |
| CitiMortgage, Inc. | | | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes    10/01/05 to 10/19/05 | 180.75 | 510. City/town taxes    10/01/05 to 10/19/05 | 180.75 |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 611,680.75 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | 396,265.06 |
| **300. CASH AT SETTLEMENT FROM OR TO BORROWER** | | **600. CASH AT SETTLEMENT TO OR FROM SELLER** | |
| 301. Gross amount due from borrower (line 120) | 689,370.69 | 601. Gross amount due to seller (line 420) | 675,256.84 |
| 302. Less amounts paid by/for borrower (line 220) | 611,680.75 | 602. Less reduction amount due seller (line 520) | 396,265.06 |
| **303. CASH FROM BORROWER** | 77,689.94 | **603. CASH TO SELLER** | 278,991.78 |

**SUBSTITUTE FORM 1099 SELLER STATEMENT:** The information contained herein is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. The Contract Sales Price described on line 401 above constitutes the Gross Proceeds of this transaction.

You are required by law to provide the settlement agent (Fed. Tax ID No: 01-0749193) with your correct taxpayer identification number. If you do not provide the settlement agent with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

TIN: 067-38-065D

SELLER(S) SIGNATURE(S): Victor L. Vacanti

SELLER(S) NEW MAILING ADDRESS: 777 7th St NW #921 DC 20001

SELLER(S) PHONE NUMBERS: 202-737-2435    (H)  202-708-0614 X 2808    (W)

Previous editions are obsolete
form HUD-1 (3/86) ref Handbook 43
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
Case 1:06-cv-01806-RWR    Document 1-3    Filed 10/18/2006    Page 2 of 2
SETTLEMENT STATEMENT    File Number 05-496
TitleExpress Settlement System  Printed 10/19/2005    JG

## L. SETTLEMENT CHARGES

| | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION based on price $575,000.00 @ 5.000 = 33,750.00 | | |
| Division of commission (line 700) as follows: | | |
| 701. $  16,875.00  to  Corus Home Realty | | |
| 702. $  16,875.00  to  Zip Realty | | |
| 703. Commission paid at Settlement | | |
| 704. $ 20,000.00 POC, Earnest Money retained as part of commission by Corus Home Realty | | 13,750. |
| 705. Administrative Fee | | 20,000. |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. Loan Origination Fee    0.125 % CitiMortgage, Inc. | 675.00 | |
| 802. Loan Discount    % | | |
| 803. Appraisal Fee | | |
| 804. Credit Report | | |
| 805. Commitment Fee    to CitiMortgage, Inc. | 565.00 | |
| 806. Application Fee    to CitiMortgage, Inc. | 500.00 | |
| 807. Assumption Fee | | |
| 808. | | |
| 809. | | |
| 810. | | |
| 811. | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. Interest From  10/19/2005 to 11/01/2005  @ $  86.9200 /day  13 Days | 1,129.96 | |
| 902. Mortgage Insurance Premium for    to | | |
| 903. Hazard Insurance Premium for    to | | |
| 904. | | |
| 905. | | |
| **1000. RESERVES DEPOSITED WITH LENDER FOR** | | |
| 1001. Hazard Insurance    mo. @ $    /mo | | |
| 1002. Mortgage Insurance    mo. @ $    /mo | | |
| 1003. City Property Taxes    mo. @ $    /mo | | |
| 1004. County Property Taxes    mo. @ $    /mo | | |
| 1005. Annual Assessments    mo. @ $    /mo | | |
| 1009. Aggregate Analysis Adjustment | | |
| **1100. TITLE CHARGES** | 0.00 | 0.0 |
| 1101. Settlement Fee    to District Title, A Corporation | | |
| 1102. Abstract or title search    to Executive Abstracting Company | 295.00 | 155.0 |
| 1103. Title examination    to District Title, A Corporation | 250.00 | |
| 1104. Title insurance binder    to District Title, A Corporation | 65.00 | 35.0 |
| 1105. Document Preparation    to District Title, A Corporation | 75.00 | |
| 1106. Notary Fees | | 75.00 |
| 1107. Attorney's fees | | |
| (includes above items No: ) | | |
| 1108. Title Insurance    to Lawyers Title Insurance Corporation | 2,246.20 | |
| (includes above items No: ) | | |
| 1109. Lender's Policy    540,000.00  - 1,662.50 | | |
| 1110. Owner's Policy    675,000.00  - 583.70 | | |
| 1111. Courier/ Overnight    to District Title, A Corporation | 65.00 | 35.00 |
| 1112. Secured Release Fee    to District Title, A Corporation | | 100.00 |
| 1113. Deed Preparation    to District Title, A Corporation | | 100.00 |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1201. Recording Fees Deed $ 26.50  ; Mortgage $ 145.50  ; Release $  26.50 | 172.00 | 26.50 |
| 1202. City Transfer Tax    Deed $7,425.00  ; Mortgage $ | 7,425.00 | |
| 1203. City Recordation Tax    Deed $7,425.00  ; Mortgage $ | | |
| 1204.    Deed $  ; Mortgage $ | | 7,425.00 |
| 1205. | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | |
| 1302. Tax Certificate    to Department of Tax and Revenue | | 15.00 |
| **1400. TOTAL SETTLEMENT CHARGES** (enter on lines 103, Section J and 502, Section K) | 13,463.16 | 41,716.50 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

SCOTT PILIE    Victor L. Vacanti
Victor L. Vacanti

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause funds to be disbursed in accordance with this statement.

Settlement Agent    10-19-05
Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U. S. Code Section 1001 and Section 1010.

# TRUTH IN LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Applicant: Scott Donald Pluta
1702 Rugby Ave.
Charlottesville, VA 22903

Lender: CitiMortgage, Inc.

Loan No: 002003272196

Property: 777 7TH ST NW
#414
WASHINGTON, DC 20001

Type of Loan: Conventional
Date: October 19, 2005
Disclosure Type: Final

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.010 % | $ 43,107.61 | $ 50,000.00 | $ 93,107.61 |

REPAYMENT: See Payment Schedule below.

| 239 | 387.95 | Monthly beginning 11/19/2005 | | |
|---|---|---|---|---|

DEMAND FEATURE: [X] This loan does not have a Demand Feature.  [ ] This loan has a Demand Feature as follows:

REQUIRED DEPOSIT: [ ] The annual percentage rate does not take into account your required deposit.

VARIABLE RATE FEATURE: [ ] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at: 777 7TH ST NW
#414
WASHINGTON, DC 20001

ASSUMPTION: Someone buying this property [X] cannot assume the remainder of the mortgage on the original terms
[ ] may assume, subject to conditions, the remainder of the mortgage on the original terms.

FILING / RECORDING FEES: $

NON-FILING INSURANCE: $ N/A

PROPERTY INSURANCE: [X] Homeowner's insurance, or fire and extended coverage, is a required condition of this loan. Also, if the property securing this loan is located in a flood hazard area, you will be required to obtain flood insurance. Borrower may purchase this insurance from any insurance company acceptable to lender.

LATE CHARGES: If a payment is more than 15 days late, you will be charged a late charge of the greater of 6.000% of your overdue payment or $5.00.

PREPAYMENT: If you pay off your loan early, you
[ ] may [X] will not  have to pay a prepayment penalty.
[ ] may [X] will not  have to pay a minimum finance charge.
[ ] may [X] will not  be entitled to a refund of part of the finance charge.

See your contract documents for any additional information about non-payment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____  10-19-05
                          BORROWER/DATE

Scott Donald Pluta
_____
                          BORROWER/DATE

_____
                          BORROWER/DATE

_____
                          BORROWER/DATE

Loan Number: 002003272196

## Our Privacy Notice

Keeping customer information secure is a top priority for all of us at Citibank®*. We are providing this privacy notice to individual clients who purchase products or receive services from us for personal, family or household purposes ("you"). We hope this helps you understand how we handle the personal information about you that we collect and may disclose. This notice explains how you may instruct us to limit disclosing personal information about you. If you have previously given us your privacy choices there is no need to do so again, unless you wish to change your instructions. If you are a joint accountholder, we will accept instructions from either of you and apply them to the entire account. The provisions of this notice will also apply to former customers as well as current customers unless we state otherwise.

When Citibank shares personal information with the Citigroup family of companies it can make it easier when you apply for accounts or services from these companies. In addition, sharing personal information can help you receive timely notice about products, services or other special offers that may be of interest to you from companies in the Citigroup family or from nonaffiliated third parties.

### Our Policies and Practices to Protect Your Personal Information

We protect personal information we collect about you by maintaining physical, electronic, and procedural safeguards that meet or exceed applicable law. Third parties who have access to personal information must agree to follow appropriate standards of security and confidentiality.

We train people who work for us how to properly handle personal information and we restrict access to it. And, as a current client, you can rely on the Citigroup Privacy Promise for Consumers that we follow as a member of the Citigroup family of companies. It is found on page 3 of this notice.

### Categories of Personal Information We Collect and May Disclose:

The personal information we collect about you comes from the following sources:
- Information we receive from you on applications or other forms, such as name, address, social security number, telephone number, occupation, assets and income,
- Information about your transactions with us, our affiliates, or nonaffiliated third parties, such as account balances, payment history, and account activity,
- Information we receive from a consumer reporting agency, such as your credit bureau reports and other information relating to your credit worthiness, and
- Information we receive about you from other sources, such as your employer and other third parties.

We may disclose any of the above information that we collect to affiliates and nonaffiliated third parties as described below.

### Categories of Affiliates To Whom We May Disclose Personal Information

Our affiliates are the family of companies controlled by Citigroup Inc. We may share personal information about you with affiliates in several different lines of business including banking, credit cards, consumer finance, securities, and insurance. Our affiliates do business under names that include CitiFinancial, Travelers Life & Annuity, Smith Barney, and Primerica.

*All references in this notice to Citibank refer to either Citibank, N.A., Citibank, F.S.B. or Citibank (West), FSB, depending upon which bank is maintaining your account or providing you with products or services.

Loan Number: 002003272196

**Categories of Nonaffiliated Third Parties To Whom We May Disclose Personal Information**

Nonaffiliated third parties are those not part of the family of companies controlled by Citigroup Inc. We may disclose personal information about you, to the following types of nonaffiliated third parties:

- Financial services providers, such as companies engaged in banking, credit cards, consumer finance, securities, and insurance.
- Non-financial organizations, such as companies engaged in direct marketing and the selling of consumer products and services.

If you check Box 1 on the Privacy Choices Form, we will not make these disclosures except as follows. First, we may disclose information about you, as described above in "Categories of Personal Information We Collect and May Disclose," to third parties that perform marketing services on our behalf or to other financial institutions with whom we have joint marketing agreements. Second, we may disclose personal information about you to third parties as permitted by law, including disclosures necessary to process and service your account, to protect against fraud, and to protect the security or confidentiality of our records.

## YOUR PRIVACY CHOICES

This section describes your privacy choices. Please remember that we will continue to protect your personal information regardless of your privacy choices.

### Disclosing to Nonaffiliated Third Parties (Box 1)

As described in this notice, we will limit the personal information we disclose about you to nonaffiliated third parties if you check Box 1 on the Privacy Choices Form.

### Sharing with Our Affiliates (Box 2)

The law allows us to share with our affiliates any information about our transactions or experiences with you. Unless otherwise permitted by law, we will not share with our affiliates other information that you provide to us or that we obtain from third parties (for example, credit bureaus) if you check Box 2 on the Privacy Choices Form.

If you are also a customer of other Citigroup affiliates and you receive a notice of their intent to share certain information about you, you will need to separately notify them if you do not want such information shared.

### Our Mailing and Telemarketing Lists (Boxes 3 and 4)

We would like to keep you informed about promotional offers from our affiliates and from nonaffiliated third parties. If you wish to be taken off our Citibank mailing and/or telephone lists that we use for such offers, please check Box 3 and/or Box 4 on the Privacy Choices Form.

We will continue to mail you information that you may find valuable in managing your Citibank account, such as the availability of special offers, credit line increases, and new or upgraded Citibank products or services even if you have checked Box 3. We may also send you promotional offers from third parties in communications that you receive from us concerning your Citibank account, such as your periodic statement.

### Information for Vermont and California Customers

In response to a Vermont regulation, we will automatically treat accounts with Vermont billing addresses as if you checked Box 1 and Box 2 on the Privacy Choices Form without requiring you to return the form. And if we disclose information about you to nonaffiliated third parties with whom we have joint marketing agreements, we will only disclose your name, address, other contact information, and information about our transactions and experiences with you.

In response to a California law, we will automatically treat accounts with California billing addresses as if you filled in Box 1 on the Privacy Choices Form and will not disclose personal information about you to nonaffiliated parties except as permitted by the applicable California law. We will also limit the sharing of information about you with our affiliates to comply with all California privacy laws that apply to us. To further restrict sharing with affiliates as described in this notice, you can fill in Box 2 of the Privacy Choices Form.

Loan Number: 002003272196

**Citigroup Privacy Promise for Consumers**

While information is the cornerstone of our ability to provide superior service, our most important asset is our customers' trust. Keeping customer information secure, and using it only as our customers would want us to, is a top priority for all of us at Citigroup. Here, then, is our promise to our individual customers:

1.  We will safeguard, according to strict standards of security and confidentiality, any information our customers share with us.

2.  We will limit the collection and use of customer information to the minimum we require to deliver superior service to our customers, which includes advising our customers about our products, services and other opportunities, and to administer our business.

3.  We will permit only authorized employees, who are trained in the proper handling of customer information, to have access to that information. Employees who violate our Privacy Promise will be subject to our normal disciplinary process.

4.  We will not reveal customer information to any external organization unless we have previously informed the customer in disclosures or agreements, have been authorized by the customer, or are required by law or our regulators.

5.  We will always maintain control over the confidentiality of our customer information. We may, however, facilitate relevant offers from reputable companies. These companies are not permitted to retain any customer information unless the customer has specifically expressed interest in their products or services.

6.  We will tell customers in plain language, initially and at least once annually, how they may remove their names from marketing lists. At any time, customers can contact us to remove their names from such lists.

7.  Whenever we hire other organizations to provide support services, we will require them to conform to our privacy standards and to allow us to audit them for compliance.

8.  For purposes of credit reporting, verification and risk management, we will exchange information about our customers with reputable reference sources and clearinghouse services.

9.  We will not use or share - internally or externally - personally identifiable medical information for any purpose other than the underwriting or administration of a customer's policy, claim or account, or as disclosed to the customer when the information is collected, or to which the customer consents.

10. We will attempt to keep customer files complete, up to date, and accurate. We will tell our customers how and where to conveniently access their account information (except when we're prohibited by law) and how to notify us about errors which we will promptly correct.

© 2005 Citibank
Citibank, N.A., Citibank, FSB,
Citibank (West), FSB
Member FDIC
Citibank is a registered service mark of Citicorp.

# NOTE

October 19, 2005
[Date]

Washington
[City]

Dist. of Columbia
[State]

777 7TH ST NW, #414, WASHINGTON, DC 20001
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 540,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **CitiMortgage, Inc.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  5.875      %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the  First       day of each month beginning on  December 1, 2005         . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  November 1, 2035        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  1000 Technology Drive, O' Fallon, MO  63368-2240

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ 3,194.30

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

002003249223

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-5N (0207)

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 3

Form 3200 1/01

Initials: SP

CitiMortgage 2.9.1.30 V2

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of  15         calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be  5.000              % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

002003249223

-5N (0207)

Form 3200 1/01
Initials:
CitiMortgage 2.9.1.30 V2

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____

_____                          _____ (Seal)
                                                         Scott Donald Plut            -Borrower

                                                         *(Sign Original Only)*

002003249223

-5N (0207)                          Page 3 of 3                      Form 3200 1/01
                                                                    CitiMortgage 2.9.1.30 V2

## TRUTH IN LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Applicant: Scott Donald Pluta
1702 Rugby Ave.
Charlottesville, VA  22903

Lender: CitiMortgage, Inc.

Loan No: 002003249223

Property: 777 7TH ST NW
#414
WASHINGTON, DC  20001

Type of Loan: Conventional
Date: October 19, 2005
Disclosure Type: Final

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 5.912 % | $  613,246.65 | $  536,705.04 | $ 1,149,951.69 |

REPAYMENT: See Payment Schedule below.

| 359 | 3,194.30 | Monthly beginning 12/01/2005 | | | |
|---|---|---|---|---|---|

DEMAND FEATURE: [X] This loan does not have a Demand Feature.    [ ] This loan has a Demand Feature as follows:

REQUIRED DEPOSIT: [X] The annual percentage rate does not take into account your required deposit.

VARIABLE RATE FEATURE: [ ] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at:    777 7TH ST NW
#414
WASHINGTON, DC  20001

ASSUMPTION: Someone buying this property [X] cannot assume the remainder of the mortgage on the original terms
[ ] may assume, subject to conditions, the remainder of the mortgage on the original terms.

NON-FILING INSURANCE: $ N/A

PROPERTY INSURANCE: [X] Homeowner's insurance, or fire and extended coverage, is a required condition of this loan. Also, if the property securing this loan is located in a flood hazard area, you will be required to obtain flood insurance. Borrower may purchase this insurance from any insurance company acceptable to lender.

LATE CHARGES: If a payment is more than 15 days late, you will be charged a late charge of _5.000_% of the payment.

PREPAYMENT: If you pay off your loan early, you
[ ] may [X] will not   have to pay a prepayment penalty.
[ ] may [X] will not   have to pay a minimum finance charge.
[ ] may [X] will not   be entitled to a refund of part of the finance charge.

See your contract documents for any additional information about non-payment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____
BORROWER/DATE

_____    10-19-05
Scott Donald Pluta        BORROWER/DATE

_____
BORROWER/DATE

_____
BORROWER/DATE

159003 - 07/22/2002 [002003249223]
CitiMortgage 2.9.1.30 V2

## Uniform Residential Loan Application

00200324922

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

| Mortgage Applied for: | ☐ V.A. | ☒ Conventional | ☐ Other: | Agency Case Number | Lender Case Number |
|---|---|---|---|---|---|
| | ☐ FHA | ☐ USDA/Rural Housing Service | | | |

| Amount | Interest Rate | No. of Months | Amortization Type: | |
|---|---|---|---|---|
| $ 540,000.00 | 5.875 % | 360 | ☒ Fixed Rate  ☐ Other (explain): | ☐ GPM  ☐ ARM (type): |

**Subject Property Address** (street, city, state, ZIP)
777 7TH ST NW, #414, WASHINGTON, DC 20001-    County: DISTRICT OF COL    No. of Units: 1

**Legal Description of Subject Property** (attach description if necessary)
See Schedule A Attached Hereto And Made A Part Hereof    Year Built: 2004

| Purpose of Loan | ☒ Purchase | ☐ Construction | ☐ Other (explain): | Property will be: |
|---|---|---|---|---|
| | ☐ Refinance | ☐ Construction-Permanent | | ☒ Primary Residence  ☐ Secondary Residence  ☐ Investment |

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

**Complete this line if this is a refinance loan.**

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made |
|---|---|---|---|---|
| | $ | $ | | Cost: $ |

| Title will be held in what Name(s) | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| Scott Pluta And James Wynn | Joint Tenants | ☒ Fee Simple  ☐ Leasehold (show expiration date) |

**Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain)**
Checking/Savings,Secured Borrower Funds,Deposit on Sales Contract   TOTAL : $135,000.00

| Borrower's Name (include Jr. or Sr. if applicable) | Co-Borrower's Name (include Jr. or Sr. if applicable) |
|---|---|
| Scott Donald Pluta | |

| Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School | Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School |
|---|---|---|---|---|---|---|---|
| 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 | (434) 242-1615 | 1/22/1978 | 18 | | | | |

| ☐ Married  ☒ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Co-Borrower) no. / ages | ☐ Married  ☐ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Borrower) no. / ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP)  ☐ Own ☒ Rent  1y 0m  No. Yrs. | Present Address (street, city, state, ZIP)  ☐ Own ☐ Rent  No. Yrs. |
|---|---|
| 1702 Rugby Ave. | |
| Charlottesville, VA 22903- | |

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

**If residing at present address for less than two years, complete the following:**

| Former Address (street, city, state, ZIP)  ☐ Own ☒ Rent  1y 0m  No. Yrs. | Former Address (street, city, state, ZIP)  ☐ Own ☐ Rent  No. Yrs. |
|---|---|
| 1917 Lewis Mountain Road | |
| Charlottesville, VA 22903- | |

| Name & Address of Employer  ☐ Self Employed | Yrs. on this job | Name & Address of Employer  ☐ Self Employed | Yrs. on this job |
|---|---|---|---|
| Winston & Strawn LLP | 0y 2m | | |
| 1799 K Street NW | Yrs. employed in this line of work/profession | | Yrs. employed in this line of work/profession |
| Washington, DC 20005-3817 | 0y 2m | | |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|
| Associate Attorney/Attorneys At Law | (202) 282-5922 | | |

**If employed in current position for less than two years or if currently employed in more than one position, complete the following:**

| Name & Address of Employer  ☐ Self Employed | Dates (from - to) | Name & Address of Employer  ☐ Self Employed | Dates (from - to) |
|---|---|---|---|
| University Of Virginia | 8/4/1997 - 5/2/2005 | | |
| Charlottesville, VA 22903- | Monthly Income | | Monthly Income |
| | $ | | $ |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|
| Full Time Law Student/College/university | | | |

| Name & Address of Employer  ☐ Self Employed | Dates (from - to) | Name & Address of Employer  ☐ Self Employed | Dates (from - to) |
|---|---|---|---|
| | Monthly Income | | Monthly Income |
| | $ | | $ |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|

| Borrower's Signature | Date |
|---|---|
| X | 10-19-05 |
| Co-Borrower's Signature: | Date |
| X | |

1003-NEW - 06/13/06 CitiMortgage 2.9.1.30 V2
CitiMortgage 2.9.1.30 V2

Fannie Mae Form 1003 01/04
Freddie Mac Form 65 01/04

00200324922

| Gross Monthly Income* | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 10,416.67 | $ | $ 10,416.67 | Rent | $ 450.00 | |
| Overtime | | | | First Mortgage (P&I) | | $ 3,194.3 |
| Bonuses | | | | Other Financing (P&I) | | 292.0 |
| Commissions | | | | Hazard Insurance | | |
| Dividends/Interest | | | | Real Estate Taxes | | 152.6 |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | 772.7 |
| | | | | Other: | | |
| Total | $ 10,416.67 | $ | $ 10,416.67 | Total | $ 450.00 | $ 4,411.7 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| B/C | Describe Other Income | Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|---|
| (B) | Other | | $ |

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrowe section was completed about a spouse, this Statement and supporting schedules must be completed about that spouse also.

| ASSETS | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | Completed ☐ Jointly ☒ Not Jointly | | |
|---|---|---|---|---|---|
| Description | | | LIABILITIES | Monthly Pmt. & Mos. Left to Pay | Unpaid Balance |
| Cash deposit toward purchase held by: Citibank Chk#387 | $ 20,000.00 | Name and address of Company US DEPT OF EDUCATION | $ Pmt./Mos. 397.00 94 | | $ 37,000.00 |
| List checking and savings accounts below | | Acct. no. 3978420181 | | | |
| Name and address of Bank, S&L, or Credit Union Citibank Citigold | | Name and address of Company ACS/B OF A | $ Pmt./Mos. 200.00 92 | $ | |
| Acct. no. 3196040399 | $ 2,366.41 | | | | 18,315.00 |
| Name and address of Bank, S&L, or Credit Union Citibank Citigold Insured MMA | | Acct. no. -3978420181 | | | |
| | | Name and address of Company ACS/BANK OF AMERICA (i) | $ Pmt./Mos. 200.00 92 | | |
| Acct. no. 3196040339 | $ 5,080.59 | | | | 18,315.00 |
| Name and address of Bank, S&L, or Credit Union Bank Of America Express | | Acct. no. 3978420181 | | | |
| | | Name and address of Company CITIBANK N A | $ Pmt./Mos. 105.00 117 | $ | |
| Acct. no. 003125439675 | $ 1,001.81 | | | | 12,215.00 |
| Name and address of Bank, S&L, or Credit Union Citibank Roth IRA | | Acct. no. 39784201820 | | | |
| | | Name and address of Company CITIBANK STU (i) | $ Pmt./Mos. 105.00 117 | $ | |
| Acct. no. 32C34632 | $ 31,027.69 | | | | 12,215.00 |
| Stocks & Bonds (Company name/number & description) | $ | Acct. no. 3978420 | | | |
| | | Name and address of Company CITIBANK N A | $ Pmt./Mos. 104.00 117 | | |
| Life insurance net cash value Face amount: $ | | | | | 12,072.00 |
| Subtotal Liquid Assets | $ 59,476.50 | Acct. no. 39784201821 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ | Name and address of Company CITIBANK STU (i) | $ Pmt./Mos. 104.00 117 | | |
| Vested interest in retirement fund | $ 10,000.00 | | | | 12,072.00 |
| Net worth of business(es) owned (attach financial statement) | $ | Acct. no. 3978420 | | | |
| Automobiles owned (make and year) 2000 Jeep Cherokee | $ 7,000.00 | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | | |
| Other Assets (itemize) | $ | Job Related Expense (child care, union dues, etc.) | $ | | |
| | | Total Monthly Payments | $ 1,205.00 | | |
| Total Assets a. | $ 76,476.50 | $ -123,444.50 | Total Liabilities b. | $ 199,921.00 | |

Borrower's Signature: X _____ Date 10-19-05    Co-Borrower's Signature: X _____ Date

1003-NEW - 06/17/05 CitiMortgage 2.9.1.30 V2
CitiMortgage 2.9.1.30 V2

Page 2

Fannie Mae Form 1003 01/04
Freddie Mac Form 65 01/04

00200324922

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| | | | | | | | |
| | Totals | $ | $ | $ | $ | $ | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

| | | | If you answer "Yes" to any questions a through i, please use continuation sheet for explanation. | Borrower | | Co-Borrower | |
|---|---|---|---|---|---|---|---|
| | | | | Yes | No | Yes | No |
| a. | Purchase price | $ 675,000.00 | | | | | |
| b. | Alterations, improvements, repairs | | a. Are there any outstanding judgments against you? | | X | | |
| c. | Land (if acquired separately) | | b. Have you been declared bankrupt within the past 7 years? | | X | | |
| d. | Refinance (incl. debts to be paid off) | | c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | |
| e. | Estimated prepaid items | 1,219.96 | d. Are you a party to a lawsuit? | | X | | |
| f. | Estimated closing costs | -40,845.00 | e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | | |
| g. | PMI, MIP, Funding Fee | | | | | | |
| h. | Discount (if Borrower will pay) | 675.00 | | | | | |
| i. | Total costs (add items a through h) | 635,959.96 | | | | | |
| j. | Subordinate financing | 50,000.00 | | | | | |
| k. | Borrower's closing costs paid by Seller | 3,787.50 | f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | X | | |
| l. | Other Credits (explain)<br>Citibank Chk#387 | 20,000.00 | g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | |
| | | | h. Is any part of the down payment borrowed? | | X | | |
| | | | i. Are you a co-maker or endorser on a note? | | X | | |
| | | | j. Are you a U.S. citizen? | X | | | |
| | | | k. Are you a permanent resident alien? | | X | | |
| m. | Loan amount (exclude PMI, MIP, Funding Fee financed) | 540,000.00 | l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | | |
| n. | PMI, MIP, Funding Fee financed | | m. Have you had an ownership interest in a property in the last three years? | | X | | |
| o. | Loan amount (add m & n) | 540,000.00 | (1) What type of property did you own -- principal residence (PR), second home (SH), or investment property (IP)? | | | | |
| p. | Cash from/ to Borrower (subtract j, k, l & o from i) | 22,172.46 | (2) How did you hold title to the home -- solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | | | |

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by the mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) any owner or servicer of the Loan may verify or reverify any information contained in the application from any source named in this application, and Lender, its successors or assigns may retain the original and/or an electronic record of this application, even if the Loan is not approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | 10-15-05 | X | |

The following information is requested by the Federal Government for certain types of loans related to a dwelling, in order to monitor the Lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a Lender may not discriminate on the basis of this information, nor on whether you choose to furnish it. However, if you choose not to furnish it, under Federal regulations this Lender is required to note race and sex on the basis of visual observation or surname. If you do not wish to furnish the above information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the Lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information | | CO-BORROWER | ☐ I do not wish to furnish this information | |
|---|---|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino | X Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino | ☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaskan Native | ☐ Asian | ☐ Black or African American | Race: | ☐ American Indian or Alaskan Native | ☐ Asian | ☐ Black or African American |
| | ☐ Native Hawaiian or Other Pacific Islander | X White | | ☐ Native Hawaiian or Other Pacific Islander | ☐ White |
| Sex: | ☐ Female | X Male | Sex: | ☐ Female | ☐ Male |

| To be Completed by Interviewer | Interviewer's Name (print or type)<br>Larry Osborne | Name and Address of Interviewer's Employer<br>CitiMortgage, Inc. |
|---|---|---|
| This application was taken by:<br>X face-to-face interview<br>☐ Mail<br>☐ Telephone<br>☐ Internet | Interviewer's Signature _____ Date 10/07/05 | 1000 Technology Drive<br>O'Fallon, MO 63304- |
| | Interviewer's Phone Number (incl. area code)<br>(301) 537-9037 | |

1003-NEW - 06/17/06 CitiMortgage 2.9.1.30 V2
CitiMortgage 2.9.1.30 V2

Page 3

Fannie Mae Form 1003 01/04
Freddie Mac Form 65 01/04

## Continuation Sheet/Residential Loan Application

00200324922

| Use this continuation sheet if you need more space to complete the Residential Loan Application.Mark B for Borrower or C for Co-Borrower. | Borrower:<br>Scott Donald Pluta | Agency Case Number: |
|---|---|---|
| | Co-Borrower: | Lender Case Number: |

**[Additional Liabilities]**

(B) Name:    CITIBANK N A (i)
  Addr:
  CSZ:
  Acct #:    39784201826
  Mths Remn: 116
  Mth Pymnt: $ 93.00
  Amt:    $10,750.00

(B) Name:    CITIBANK STU
  Addr:
  CSZ:
  Acct #:    3978420
  Mths Remn: 116
  Mth Pymnt: $ 93.00
  Amt:    $10,750.00

(B) Name:    CITIBANK N A
  Addr:
  CSZ:
  Acct #:    39784201824
  Mths Remn: 117
  Mth Pymnt: $ 65.00
  Amt:    $7,604.00

(B) Name:    CITIBANK STU (i)
  Addr:
  CSZ:
  Acct #:    3978420
  Mths Remn: 117
  Mth Pymnt: $ 65.00
  Amt:    $7,604.00

(B) Name:    CITIBANK N A (i)
  Addr:
  CSZ:
  Acct #:    39784201827
  Mths Remn: 116
  Mth Pymnt: $ 63.00
  Amt:    $7,295.00

(B) Name:    CITIBANK STU
  Addr:
  CSZ:
  Acct #:    3978420
  Mths Remn: 116
  Mth Pymnt: $ 63.00
  Amt:    $7,295.00

(B) Name:    CITIBANK N A
  Addr:
  CSZ:
  Acct #:    39784201822
  Mths Remn: 116
  Mth Pymnt: $ 51.00
  Amt:    $5,901.00

**[Additional Liabilities Cont'd]**

(B) Name:    CITIBANK STU (i)
  Addr:
  CSZ:
  Acct #:    3978420
  Mths Remn: 116
  Mth Pymnt: $ 51.00
  Amt:    $5,901.00

(B) Name:    CITIBANK N A
  Addr:
  CSZ:
  Acct #:    39784201825
  Mths Remn: 119
  Mth Pymnt: $ 32.00
  Amt:    $3,798.00

(B) Name:    CITIBANK STU (i)
  Addr:
  CSZ:
  Acct #:    3978420
  Mths Remn: 119
  Mth Pymnt: $ 32.00
  Amt:    $3,798.00

(B) Name:    CITIBANK N A
  Addr:
  CSZ:
  Acct #:    39784201823
  Mths Remn: 122
  Mth Pymnt: $ 9.00
  Amt:    $1,094.00

(B) Name:    CITIBANK STU (i)
  Addr:
  CSZ:
  Acct #:    3978420
  Mths Remn: 122
  Mth Pymnt: $ 9.00
  Amt:    $1,094.00

(B) Name:    CHASE
  Addr:
  CSZ:
  Acct #:    4640188001496828
  Mths Remn: 51
  Mth Pymnt: $ 59.00
  Amt:    $2,989.00

(B) Name:    CITI
  Addr:
  CSZ:
  Acct #:    4128003669195672
  Mths Remn: 69
  Mth Pymnt: $ 27.00

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
|---|---|---|---|
| X | 10-19-05 | X | |

1003-NEW - 08/17/06  CitiMortgage 2.9.1.30 V2
CitiMortgage 2.9.1.30 V2

Page 4

Fannie Mae Form 1003 01/04
Freddie Mac Form 65 01/04

## Continuation Sheet/Residential Loan Application

00200324922

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: Scott Donald Pluta | Agency Case Number: 002003249223 |
| | Co-Borrower: | Lender Case Number: |

[Additional Liabilities Cont'd]

Amt:    $1,844.00



I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: X | Date 10-19-05 | Co-Borrower's Signature: X | Date |

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

06-1806
RWR

## I (a) PLAINTIFFS

SCOTT D. PLUTA

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    11001
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Pro Se

## DEFENDANTS

CITIGROUP, INC.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    88888
(IN U.S. PLAINTIFF CASES ONLY)

CASE NUMBER   1:06CV01806

JUDGE: Richard W. Roberts

DECK TYPE: Pro se General Civil

DATE STAMP: 10/18/2006

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ● 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ● 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

### ○ A. Antitrust
- ☐ 410 Antitrust

### ○ B. Personal Injury/Malpractice
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

### ○ C. Administrative Agency Review
- ☐ 151 Medicare Act

**Social Security:**
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

**Other Statutes**
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ○ E. General Civil (Other)    OR    ● F. Pro Se General Civil

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☒ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

15 U.S.C. § 1638, 1640 - Mortgage lender violations of Truth in Lending Act and Real Estate Settlement Procedures Act

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ $500,000   Check YES only if demanded in complaint JURY DEMAND:   YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 10-18-06   SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.